IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF JAY WORCH ELECTRIC, LLC d/b/a JWE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY, *et al.*,<br><br>Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * |

Civil Action No. 8:22-cv-02420-PX

\*\*\*

## **MEMORANDUM OPINION**

Pending before the Court in this contract dispute is the motion for summary judgment filed by Plaintiff United States of America for the Use and Benefit of Jay Worch Electric, LLC d/b/a JWE, LLC ("JWE").  ECF No. 26.  No hearing is necessary.  D. Md. Loc. R. 105.6.  For the following reasons, the motion is granted in part and deferred in part.

**I.      Background**

Unless otherwise noted, the following facts are undisputed and construed most favorably to Defendants Pontiac Drywall Systems, Inc. d/b/a PDSI Contractors ("PDSI" or the "contractor") and Atlantic Specialty Insurance Company ("ASIC" or the "surety") as the non-moving parties.  This case arises out of a government contract awarded to PDSI to install lighting at a parking lot on the Naval Air Station in Patuxent River, Maryland.  *See* ECF No. 26-1 at 2; ECF No. 27 at 2.  On September 29, 2021, in connection with the project, ASIC issued a payment bond identifying PDSI as the principal contractor.[1]  *See id.*

---

[1] PDSI secured ASIC as a surety pursuant to its obligations under the Miller Act, which requires government contractors to post a surety bond "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract."  40 U.S.C. § 3131(b)(2).

On October 15, 2021, JWE and PDSI entered into a written Subcontract Agreement (the "Subcontract"), in which JWE, as subcontractor, would perform $159,259 of electrical work on the project.  *See* ECF No. 11-1 at 7.  Under the Subcontract, PDSI and JWE agreed that "progress payments will be made to [JWE] on a monthly basis for [JWE's] Work performed through the preceding month."  ECF No. 11-1 at 10.  As a condition precedent for payment, the Subcontract required that JWE submit a "draft copy of pay requests" to PDSI "no later than Monday noon of the 3rd week for each month."  *Id.* at 5.  Upon review and approval of such payment requests, JWE was also required to submit "a signed Partial Conditional Waiver and Release . . . [and] a duly executed Sworn Statement" as a condition of payment.  *Id.* at 11.  Last, the Subcontract conditioned payment to JWE on the Navy's payment to PDSI for the work performed.  *Id.* at 23 (payment "will be issued within 7 business days" from PDSI being paid for the work as the prime contractor).

Notably, the Subcontract did not address the *how* PDSI would make payment to JWE.  That is, the Subcontract was silent on to whom the payment would be directed and on the relative responsibility for payment if PDSI's efforts to pay were thwarted, whether by error, inadvertence, or third-party interference.  *See* ECF No. 11-1 at 8–18.

On May 23, 2022, JWE invoiced PDSI for work performed.  *See* ECF No. 28-7 at 3–4.  JWE President, Jay Worch ("Worch"), emailed PDSI the invoice for this payment, using his correct email address, which ends in ".com."  *See id.*; ECF No. 26-2 ¶ 7.  The next day at 2:30 p.m., PDSI Project Manager, Laith Sadik ("Sadik"), responded by email to the .com address.  *See* ECF No. 28-8 at 3.  Sadik confirmed that PDSI would pay JWE $58,850 of the invoiced amount and explained why.  *See id.*  Some 50 minutes later, Sadik received an email from an address identical to Worch's, except that this address ended in ".net" instead of ".com."  *See* ECF No.

2

27-2 at 4.  This .net email also included the same signature block for Worch with the same title and contact numbers as in the .com email.  *Compare id.* at 4– 5, *with* ECF No. 28-7 at 4.

The email from the .net addressee represented to Sadik that because JWE's primary bank account "is under review," all payments had to be made "directly into [its] Corporate account via ACH only."  ECF No. 27-2 at 4.  The .net addressee also urged that payment be made "tomorrow."  *Id.*  Six hours later, at 9:16 p.m., Sadik responded to the .net email, explaining that because the Navy must still approve payment, PDSI would not be able to pay JWE "tomorrow" as requested.  *Id.*

On May 31, 2022, Sadik received another email from the .net addressee that asked if payment would be made within the week, and that it would "forward our updated ACH bank details" to PDSI.  ECF No. 27-2 at 2.  It is unclear from the record whether Sadik responded to this email.  *See id.*  But about a week later, on June 8, 2022 at 2:06 p.m., Worch, using the .com email, sent PDSI a revised invoice for $58,850.  *See* ECF No. 28-9.  At the same time, the .net addressee also sent a revised invoice identical to that which Worch had submitted.  *See* ECF No. 11-8 at 7–8.  PDSI however, has no record of receiving the revised invoice from the .com email; it received only the one from the .net email.  *See* ECF No. 27-1 ¶ 19.

Approximately three hours later, Sadik responded by emailing Worch at his .com address a waiver and sworn statement that had to be completed prior to payment.  *See* ECF No. 28-6 at 3.  Worch, in response, emailed signed versions of the documents to Sadik along with directions to send the "check" for payment to JWE's address in Lexington Park, Maryland.  *See* ECF No. 28-4 at 2; ECF No. 28-3 ¶ 5.

Around the same time, PDSI payroll accountant, Melinda Transou ("Transou"), received an email from the .net addressee, pressing her for payment on the invoice via wire transfer.  *See*

3

ECF No. 11-8 at 3–7.  When Transou resisted, the .net addressee snapped "I told you several times, we can't receive check [sic] but since you insist, Can you mail out the check to my partner's address?  Let me know so I can send the name to be written on check [sic] and address." *Id.* at 4.

Ultimately the .net addressee acceded to payment by check.  The .net addressee provided payment directions to include that the check be made payable to "Yvens Carlo Vante" and mailed to a Bridgeport, Connecticut address.  *See* ECF No. 11-8 at 3.  In response, Transou asked for the .net addressee to sign the same waiver and sworn statement that Worch had signed for Sadik the day before.  *Id.* at 2.  The next day, the .net addressee emailed the identical notarized waiver and sworn statement that Jay Worch had previously supplied.  *Compare id.* at 9–11, *with* ECF No. 28-4 at 3–5.  PDSI, in turn, mailed the check for $58,850 to Vante at the Bridgeport, Connecticut address.  *See* ECF No. 11-9 at 2.  No evidence suggests that Vante or the Bridgeport, Connecticut address is affiliated with JWE.

Predictably, JWE never received payment.  *See* ECF No. 26-2 ¶ 5.  However, the $58,850 funds cut to Vante were deposited in an account at JP Morgan Chase ("Chase Bank").  *See* ECF No. 25 at 2.  Although not altogether clear from the record, the bank appears to have frozen the assets in connection with an investigation into the fraudulent activities behind the .net addressee.  *See id.*  To the Court's knowledge, the funds remain with Chase Bank.  *See id.*

On September 22, 2022, JWE filed suit against PDSI for breach of contract and against Defendants for a companion Miller Act claim.  ECF No. 1 ¶¶ 8–21.  The parties have since resolved all issues save for whether PDSI breached the Subcontract in failing to pay JWE the $58,850, and ASIC's companion liability under the Miller Act as a surety.  *See* ECF No. 27-1 ¶ 2. JWE now seeks summary judgment in its favor on both claims, arguing that no genuine issue

of disputed fact exists as to PDSI's breach in its failure to pay for $58,850 worth of work performed.  *See* ECF No. 26.

**II.       Standard of Review**

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56€); *see also Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004) ("[The nonmoving party's] self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.").  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  But "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'"  *Campbell v. Hewitt, Coleman & Assocs., Inc*., 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co*., 381 F.2d 245, 249 (4th Cir. 1967)).  Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is warranted.  *Celotex*, 477 U.S. at 322.

III.  Analysis

    A.  Breach of contract claim against PDSI

JWE's argument for judgment in its favor is straightforward.  JWE contends that because it had performed the work and made proper presentation for payment on the outstanding invoiced amount, and because PDSI did not pay, PDSI has breached the Subcontract as a matter of law.  To prevail on the contract claim, JWE must adduce undisputed evidence that PDSI "owed [JWE] a contractual obligation and that [PDSI] breached that obligation."  *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001).  This is precisely what JWE has done here.

The parties do not dispute that pursuant to the Subcontract, JWE satisfied all terms and conditions entitling them to payment of $58,850 for work performed.  *See* ECF No. 26-1 ¶ 5; ECF No. 27 ¶ 5.  Nor do they dispute that PDSI failed to pay JWE the amount due.  *See* ECF No. 26-1 ¶ 7; ECF No. 27 ¶ 7.  Thus, because the plain and unambiguous terms of the Subcontract compel payment, and PDSI has not paid JWE, PDSI breached the Subcontract as a matter of law.  *See Sy-Lene of Washington, Inc. v. Starwood Urb. Retail II, LLC*, 376 Md. 157, 167 (2003) ("When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used.").

PDSI, for its part, simply responds that it was not "at fault" for its failure to pay JWE.  ECF No. 27 at 9.  PDSI insists, without legal support or any real analysis, that it simply "cannot be held responsible" for the fraudster who hacked JWE computers and took over Worch's email.  *Id.*  It seems plain that JWE's computer systems were breached.  But even assuming, as PDSI urges, that JWE's own substandard internet security led to the hack, this alone does not excuse PDSI from its contractual obligations.

As a rule, "contract liability is strict liability;" once parties agree to terms of performance under a contract, the parties must fulfill those terms or be liable for damages arising from the breach.  *See* Restatement (Second) of Contracts 11 Intro. Note (1981); *see also Panitz v. Panitz*, 144 Md. App. 627, 638–39 (2002).  By extension, should a party not wish to "undertake so extensive an obligation" if performance is frustrated, the party must protect itself by expressly limiting such exposure under the terms of the contract.  *See* Restatement (Second) of Contracts 11 Intro. Note (1981).  So, for example, contracts often include language qualifying performance obligations, such as clarifying that "best efforts" may suffice, or that acts of God may excuse performance.  *Id.*  But absent express, bargained-for limitations on liability, a party in breach must pay for those damages resulting from the breach.  *See id.*

Here, the plain and unambiguous terms of the Subcontract obligate PDSI to pay JWE once the work is performed, PDSI is paid from the Navy, and JWE has provided the waiver, release, and sworn statement.  *See* ECF No. 11-1 at 11.  All such conditions were met.  *See* ECF No. 28-4 at 2–5.  The Subcontract provides no other qualification or contingency on PDSI's payment, and so, without more, PDSI must pay JWE the monies owed.  In this regard, PDIS's "fault" argument is misplaced and does not relieve PDSI from this contractual obligation.[2]  Thus, summary judgment is granted in JWE's favor on the contract claim.

    **B.**    **Miller Act claim**

---

[2] The Court recognizes that in extraordinary circumstances, it may exercise its equitable powers to relieve the performing party from its duties under a contract.  *See* Restatement (Second) of Contracts 11 Intro. Note (1981); *see also Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 271–72 (4th Cir. 1987) (accepting contractor's impracticability defense excusing performance due to unexpected, significant change in government policy); *Benton Cnty. Wind Farm LLC v. Duke Energy Indiana, Inc.*, 843 F.3d 298, 309–10 (7th Cir. 2016) (noting that impossibility could potentially excuse performance when unexpected change in circumstance rendered performance "unreasonably costly"); *cf. World of Boxing LLC v. King*, 56 F. Supp. 3d 507, 513–15 (S.D.N.Y. 2014) (denying impossibility defense when change in circumstance was foreseeable).  PDSI does not seek such relief, nor does the Court find any support for doing so here.

Turning next to JWE's Miller Act claim, the Miller Act protects subcontractors' rights to payment for work performed on federal construction projects by obligating prime contractors to secure a surety that will "make good the obligations" to the subcontractor should the prime contractor default.  *See F.D. Rich Co., Inc. v. U.S. f/u/o Indus. Lumber Co., Inc.*, 417 U.S. 116, 121–22 (1974); *United States ex rel. Sherman v. Carter*, 353 U.S. 210, 216–17 (1957); 40 U.S.C. § 3131(b)(2).  If the contractor fails to pay the subcontractor within 90 days for labor performed or for materials supplied, the subcontractor may sue the surety "on the payment bond for the amount unpaid."  § 3133(b)(1).  Generally, "[a] surety's liability under the Miller Act is measured by the general contractor's liability under the construction contract." *Consol. Elec. & Mechanicals, Inc. v. Biggs Gen. Contracting, Inc.*, 167 F.3d 432, 435 (8th Cir. 1999); *see also United States ex rel. Walton Tech., Inc. v. Weststar Eng'g, Inc.*, 290 F.3d 1199, 1206–08 (9th Cir. 2002).

The pleadings on this claim are sparse.  Neither side provides any legal or factual framework for how the Court should resolve the claim.  Indeed, the record does not include any documentation of the Bond's terms of coverage.  Accordingly, while all parties seem to agree that if PDSI must pay under the Subcontract, then per the Miller Act, so must ASIC as its surety, the Court will defer on reaching this claim. *Cf. United States for use & benefit of Tusco, Inc. v. Clark Constr. Grp., LLC*, 235 F. Supp. 3d 745, 748 (D. Md. 2016) ("*Under the terms of the Bond*, Travelers agreed to be bound jointly and severally with Clark to make payment to all persons having a direct contractual relationship with Clark or to any of Clark's subcontractors who furnished labor, material, or both." (emphasis added)); *United States v. Cont'l Cas. Co.*, No. ELH-16-3047, 2017 WL 3642957, at *1 (D. Md. Aug. 24, 2017) ("*As a condition of the Prime Contract*, and pursuant to section 3131(b) of the Miller Act, Grunley obtained 'a labor and

material payment bond' . . . , secured jointly and severally by Continental Casualty Company and Liberty Mutual Insurance Company." (emphasis added)).

### C. Defendants' counterclaim

Similarly, none of the parties address the potential effect on PDSI's counterclaim were the Court to grant summary judgment in JWE's favor. *See* ECF No. 11 at 13–16. Although JWE obliquely suggests that the counterclaim regarding an award of attorneys' fees under the Subcontract may be "dismissed," *see* ECF No. 26-1 at 4, the Court cannot accord final relief on the counterclaim based on this thin reference.

## IV. Conclusion

For the foregoing reasons, JWE's motion for summary judgment is GRANTED in part and DEFERRED in part. Because the pleadings do not sufficiently address the Miller Act claim and the Defendants' counterclaim, a recorded conference with the parties is scheduled for June 3, 2024 at 9:00 a.m. to discuss next steps.

A separate Order follows.

May 21, 2024  /s/
Date   Paula Xinis
       United States District Judge